[No. A142994. First Dist., Div. Five. July 19, 2016.]

U.S. BANK NATIONAL ASSOCIATION, as Trustee, etc., Plaintiff and Respondent, v.
STEPHANIE NAIFEH et al., Defendants and Appellants.

## Counsel

Sheik Law, Mani Sheik; Murchison & Cumming, John Podesta and Jennifer K. Letulle for Defendants and Appellants.

Parker Ibrahim & Berg, John M. Sorich, Jenny L. Merris, Heather E. Stern; Alvarado & Smith and Theodore E. Bacon for Plaintiff and Respondent.

## Opinion

**NEEDHAM, J.**—Stephanie Naifeh, Stephen Easterly, and Sam Segall appealed from a judgment entered against them for cancellation of written instruments. (Civ. Code, § 3412.) U.S. Bank National Association (U.S. Bank or respondent) alleged that Naifeh and Segall had fraudulently signed and recorded numerous documents, which purported to divest respondent of title to the real property it had obtained through the foreclosure process after Naifeh defaulted on her loan. Appellants, on the other hand, argued that Naifeh had rescinded the loan transaction pursuant to the Truth in Lending Act (TILA; 15 U.S.C. § 1601 et seq.), the relevant security interest was therefore void, and for this and other reasons respondent had no interest in the property.

Appellants contend (1) the trial court erred in ruling that Naifeh's notice of rescission was insufficient to rescind the loan transaction; (2) respondent should not have been allowed to pursue its cancellation of instruments claims, because even if the court properly allowed an amendment at trial to substitute respondent for its predecessor in interest, respondent omitted a quiet title

claim from its amended pleading; (3) respondent did not have standing to seek cancellation of the instruments because it had no interest in the real property, due to the absence of any timely lawful assignment; and (4) the court made a number of erroneous procedural rulings.

Because of a decision issued by the United States Supreme Court after the trial court's ruling in this case, we will vacate the judgment and remand for further proceedings, including the adjudication of appellants' affirmative defense of rescission.

In the portion of the opinion certified for publication, we conclude that a borrower may rescind the loan transaction under the TILA without filing a lawsuit, but when the rescission is challenged in litigation, the court has authority to decide whether the rescission notice is timely and whether the procedure set forth in the TILA should be modified in light of the facts and circumstances of the case. In the portion of the opinion not certified for publication, we conclude that appellants' remaining arguments lack merit.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The Loan and Foreclosure*

In March 2007, Naifeh and Dusan Ristic obtained a $500,000 residential loan (Loan) from Washington Mutual Bank, FA (WaMu), in connection with certain real property in San Francisco (Property). The note was secured by a deed of trust recorded against the Property on April 6, 2007. The deed of trust identified WaMu as the lender and beneficiary, California Reconveyance Company (CRC) as the trustee, and Naifeh and Ristic as the borrowers.

Before the loan closed, WaMu gave Naifeh and Ristic what purported to be a disclosure of the loan terms as required by the TILA. (See 15 U.S.C. § 1635.) As discussed *post*, Naifeh contends the TILA disclosures were deficient.

### 1. *Chase Becomes the Loan Servicer*

On or about May 1, 2007, WaMu entered into a "Pooling and Servicing Agreement" pursuant to which the Loan (along with other loans) was securitized and, at some point, placed into the "WaMu Mortgage Pass-Through Certificate Series 2007-HY-6 Trust." The pooling and servicing agreement defined WaMu as the servicer of the trust, with authority to foreclose.

By September 25, 2008, the Federal Deposit Insurance Corporation (FDIC) placed WaMu into receivership. On or about that date, JPMorganChase, National Association (Chase) acquired certain assets and liabilities of WaMu from the FDIC, as receiver for WaMu, including WaMu's interest in the Loan. Respondent contends that Chase became the servicer of the Loan, and Chase possessed the records related to the Loan and the original note.

### 2. *Assignment to Bank of America, NA, as Trustee of the HY06 Trust*

An "Assignment of Deed of Trust" recorded on March 31, 2009, states that Chase, as successor in interest to WaMu, assigned "all beneficial interest" under the deed of trust to "Bank of America, National Association as successor by merger to 'LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-HY06 Trust' " (BofA).

### 3. *Naifeh's and Ristic's Default*

Meanwhile, Naifeh defaulted on the Loan in 2008 by failing to make payments. A "Notice of Default and Election to Sell Under Deed of Trust" was recorded by trustee CRC on March 31, 2009.

In 2008 and 2009, Naifeh sought a modification of the Loan. WaMu denied the modification request. Chase purportedly offered a modification, but no modification was ultimately agreed upon.

On July 10, 2009, a "Notice of Trustee's Sale" was recorded, stating that the Property would be sold at a public auction later that month. The trustee's sale was postponed to May 2010.

### 4. *Naifeh's Notice of Rescission*

After the notice of trustee's sale, Naifeh sent a letter to CRC on July 18, 2009, with copies to the "CFO" of WaMu and the "CFO" of Chase, notifying them that she and Ristic were rescinding the loan pursuant to "Regulation Z" (12 C.F.R. § 226.33(b) (2016)) based on certain deficiencies in the TILA disclosures. A similar letter, dated July 20, 2009, attached a rescission form signed by Naifeh and Ristic. Naifeh contends that WaMu, Chase, and CRC received the rescission notice but took no action.

On December 18, 2009, Naifeh sent another rescission notice to WaMu, Chase, and CRC, purportedly pursuant to the TILA. That same month, she sent a written request to CRC, WaMu, Chase, and others for verification of the debt.

In January 2010, Naifeh learned that the note and deed of trust had purportedly been transferred from Chase to BofA. According to Naifeh, she sent "Bank of America" copies of her rescission notices and debt verification request. The bank acknowledged receipt of the notices and asked Naifeh for the property address, account number, and other identifying information, but then told her it could not find any records related to the property other than old mortgages that had already been paid off.

Naifeh sent follow-up letters to the "CFO" of "Bank of America, NA," as well as to WaMu, Chase and CRC on January 20, 2010, January 27, 2010, and February 2, 2010. On March 24, 2010, she sent further correspondence to Chase, CRC, and Chase's attorneys, inquiring about a variety of matters including the location and validity of the note and deed of trust, and proposing to "settle and close this matter."

### 5. Naifeh's Recording of False Documents

Beginning in April 2010—the month before the scheduled foreclosure sale of the Property—Naifeh and a friend (appellant Segall) caused several documents to be recorded with the county recorder, by which Naifeh purported to show she owed nothing on the Loan and was released from the mortgage debt.[1]

Specifically, on April 5, 2010, Naifeh recorded a "Substitution of Trustee," which she signed with the false representation that she was an "authorized representative" of CRC. The document purported to substitute Segall as trustee under the deed of trust, in place of CRC.

On April 20, 2010, Naifeh and Segall recorded a "Modification of Deed of Trust," which Segall signed as "Authorized Agent, Trustee" and Naifeh signed as "Trustor, Authorized Representative." The Modification of Deed of Trust, falsely purporting to be an agreement between Naifeh and Chase, stated that the deed of trust had "erroneously set forth the amount of indebtedness secured thereby as being $500,000," and modified the deed of trust "to correctly reflect the amount of indebtedness secured thereby to be zero dollars ($0.00) and to reflect a status of 'paid as agreed.' "[2]

On April 26, 2010, Naifeh recorded a "Full Reconveyance," which Segall falsely executed as "Trustee/Authorized Agent," and which purported to reconvey the deed of trust and reflect satisfaction of Naifeh's debt.

---

[1] Ristic conveyed his interest in the Property to Naifeh on April 2, 2010.

[2] Naifeh testified, and appellants maintain in their opening brief, that she signed and recorded these documents to reflect the rescission that she believed had already transpired. The Modification of Deed of Trust says nothing about any rescission, but instead represents that the deed of trust had misstated the amount secured.

On May 25, 2010, Naifeh recorded another substitution of trustee "to reflect correction of" the substitution of trustee recorded on April 5, 2010. In this document, Naifeh falsely executed the substitution of trustee as "Trustor/Beneficiary" of BofA (that is, "Bank of America, National Association as Successor by Merger to LaSalle Bank NA as Trustee for WAMU Mortgage Pass-Through Certificates Series 2007-HY06") and appointed Segall as trustee "in place and instead of said" CRC.

### 6. *Foreclosure Sale*

Naifeh was present at the trustee's sale on May 24, 2010. She handed out "buyer beware" notices representing that the trustee knew there were contrary claims to title. No one bid on the Property.

A "Trustee's Deed Upon Sale" was recorded on June 2, 2010, pursuant to which CRC, as trustee under the deed of trust, granted title to the Property to BofA.

### 7. *Naifeh's Recording of More False Documents*

On June 11, 2010, Naifeh recorded a document entitled, "Rescission of Trustee's Deed." This document did not assert that Naifeh had rescinded the Loan or that the security interest had accordingly become void. Instead, Segall, falsely representing himself to be the trustee under the deed of trust, declared that (1) the Trustee's Deed Upon Sale to BofA, recorded on June 2, 2010, "is hereby rescinded for the reason that Sale was mistakenly conducted without authorization of Beneficial Interest Holder, reference California UCC File No. 10-7227117967," and (2) as to the deed of trust recorded on April 6, 2007, Segall (as trustee) "does hereby revoke said deed and declare that henceforth said deed shall not have any further force and effect having been revoked by this instrument, executed, acknowledged, and recorded." In short, this document purported to eliminate both the deed of sale by which BofA held title and the original deed of trust that secured Naifeh's indebtedness.

Next, having ostensibly obliterated BofA's interest in the Property, Naifeh transferred the Property to appellant Easterly. An "Agreement for Sale," recorded on October 15, 2010, and purportedly entered into by Naifeh and Easterly on October 12, 2010, referenced the sale of the Property from Naifeh (as "Owner/Seller") to Easterly. Attached as an exhibit was a "Purchase Agreement" signed by Naifeh and Easterly; appellants Adam White and Andrea White signed as witnesses.

Naifeh then executed and recorded a "Warranty Deed" on November 4, 2010, purporting to transfer title to the Property to Easterly for "value

received," which was specified to be "equivalent to $407,500 U.S. Dollars." Adam White and Andrea White signed as witnesses to Naifeh's signature.

On December 30, 2010, Segall recorded an agreement and "Power of Attorney," by which Easterly granted Segall a power of attorney. A rental agreement, by which Easterly rented the Property to Adam White, was executed on January 18, 2011.

## B. *BofA's Lawsuit*

On April 4, 2011, BofA filed a verified complaint against Naifeh, Segall, Easterly, Adam White, and Andrea White, asserting eight causes of action for cancellation of instruments, as well as causes of action to quiet title, for declaratory relief, and for injunctive relief.

Easterly, Segall, and Adam White answered the complaint. Naifeh and Andrea White did not respond, and defaults were entered against them. Naifeh moved to set aside the default multiple times, but the motions were denied. However, no default judgment was entered against Naifeh, and she was present at trial and testified as a witness.[3]

### 1. *Trial*

A bench trial commenced on January 27, 2014, with BofA as the named plaintiff; after several days of trial, closing arguments were heard on July 1, 2014. The proceedings included the following.

#### a. *Amendment Adding U.S. Bank and Omitting Quiet Title Claim*

On January 27, 2014, BofA sought leave to amend the complaint to reflect a new trustee of the HY06 trust, replacing BofA with "U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association as Trustee as successor by merger to LaSalle Bank, National Association as Trustee for WaMu Mortgage Pass-Through Certificates Series 2007-HY6 Trust."

Counsel represented that the proposed amended complaint would differ only in the name of the plaintiff, and U.S. Bank would be asking title to be

---

[3] Adam White was dismissed from the action on the first day of trial, leaving Easterly, Segall, and Andrea White as defendants. Neither Adam White nor Andrea White is a party to the appeal. Appellants represent in their opening brief that Segall died after judgment was entered, and the parties have stipulated that Naifeh is Segall's assignee, successor in interest, and personal representative for purposes of the appeal.

quieted in its favor. The trial court granted leave to amend on March 5, 2014, finding no prejudice to appellants.[4]

The first amended complaint was filed on March 14, 2014. The pleading reflected not only a change in the plaintiff (from BofA to U.S. Bank), but also the omission of the quiet title cause of action. The trial court dismissed the quiet title cause of action as to former plaintiff BofA. (See Code Civ. Proc., § 581, subd. (d).)

Appellants moved to dismiss the action altogether, arguing that the dismissal of the quiet title claim had a res judicata effect and required the dismissal of ancillary claims such as cancellation of instruments. The motion was denied.

b. *Respondent U.S. Bank's Contentions at Trial*

Respondent U.S. Bank produced evidence that the eight documents recorded by Naifeh and Segall were unauthorized, fraudulent, and void. The documents were not in Chase's files, suggesting they were not executed by or at the direction of Chase. In addition, Naifeh and Segall were not authorized to execute documents on CRC's behalf, and they were neither employed by Chase nor authorized to execute documents on Chase's behalf. And Naifeh was not authorized to execute documents on behalf of BofA.

c. *Appellants' Contentions at Trial*

Appellants contended, among other things, that respondent was not entitled to prevail based on two affirmative defenses: rescission under the TILA, and lack of standing or unclean hands. Rescission was appropriate, appellants argued, because the TILA disclosures were deficient in several respects: they were not grouped together and segregated from other information; the finance charge and annual percentage rate were not more conspicuous than the other loan terms; there was no disclosure of the creditor; and several key items required for an adjustable rate mortgage (ARM) were not disclosed (including notification of the rate cap, a historical example, and an ARM brochure highlighting the risks of an ARM).[5] Moreover, appellants maintained, Naifeh's notice of rescission automatically rendered the security interest in the Property void, precluded the foreclosure sale, and precluded respondent from prevailing on the cancellation of instruments claims.

---

[4] The parties do not dispute that on January 11, 2011, after BofA purportedly obtained title to the Property, respondent succeeded BofA as trustee of the HY06 Trust.

[5] Not all of these (if any) were identified in Naifeh's notice of rescission.

### 2. *Trial Court's Statement of Decision*

After the trial court issued a "Tentative Statement of Decision" and appellants filed an objection, the court issued its final statement of decision on August 21, 2014.

In its statement of decision, the court found that respondent had standing to pursue the lawsuit, was injured by appellants' recording of the fraudulent documents, and proved its cancellation claims. In addition, the court rejected appellants' affirmative defenses: the notice of rescission sent by Naifeh under the TILA did not effect a rescission, and appellants did not establish an unclean hands defense because U.S. Bank had standing and it was Naifeh and Segall who tried to "wipe out the lien by pretending to be authorized agents or employees of CRC or Bank of America or JPMorgan Chase." The court concluded: "This is not a strong position from which to argue that Plaintiff has unclean hands."

The trial court observed that, although the first amended complaint sought declaratory relief and injunctive relief, respondent's proposed statement of decision did not seek relief on those claims. The court did not address them.

Judgment was entered in favor of respondent. This appeal followed.

## II. DISCUSSION

The sole cause of action respondent pursued at trial was for cancellation of instruments, specifically, eight claims for cancellation of instruments, one for each document recorded by Naifeh or Segall.

■ Under Civil Code section 3412, "[a] written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled." To prevail on a claim to cancel an instrument, a plaintiff must prove (1) the instrument is void or voidable due to, for example, fraud, and (2) there is a reasonable apprehension of serious injury including pecuniary loss or the prejudicial alteration of one's position. (See *Turner v. Turner* (1959) 167 Cal.App.2d 636, 641 [334 P.2d 1011].)

Substantial evidence supported the conclusion that the recorded documents were void or voidable due to fraud, in that appellants did not have the authority they claimed to execute and record the documents. Substantial evidence also supported the conclusion that respondent would suffer pecuniary loss and a prejudicial change of position if the fraudulent documents were

not cancelled, since respondent held title to the Property: respondent was successor to BofA, and BofA had obtained title to the Property by the trustee's deed of sale. Furthermore, Naifeh undisputedly failed to pay her obligations under the Loan, Chase had obtained WaMu's interest in the Loan from the FDIC, and BofA had obtained all beneficiary interest under Naifeh's deed of trust (as evinced by the recorded assignment executed by Chase), providing a basis for the foreclosure proceeding against Naifeh and the trustee's deed of sale to BofA. The fraudulent documents that appellants recorded prejudiced respondent, since the documents they recorded before the trustee's sale affected the amounts recovered on the Loan, and the documents they recorded after the trustee's sale deprived respondent of clear title to the Property.

Appellants contend, however, that the judgment in favor of respondent should nonetheless be reversed because (1) Naifeh rescinded the Loan; (2) the omission of the quiet title claim precluded the cancellation of instruments claims; (3) respondent lacked standing because it actually had no interest in the Property; and (4) the trial court made procedural errors. We address each contention in turn.

### A. *Naifeh's Rescission Notice*

As an affirmative defense to respondent's cancellation of instruments claims, appellants asserted that Naifeh rescinded the Loan on July 18, 2009, and BofA's security interest in the Property automatically became void under the TILA. As a result, appellants argue, the foreclosure sale was void, and respondent, whose interest derived from BofA, had no standing to complain about Naifeh's post-rescission fraudulent recordings.

Appellants insist this result is compelled by the United States Supreme Court's decision in *Jesinoski v. Countrywide Home Loans, Inc.* (2015) 574 U.S. ___ [190 L.Ed.2d 650, 135 S.Ct. 790] (*Jesinoski*). We summarize relevant provisions of the TILA, consider *Jesinoski* and other cases, and conclude we must remand for the trial court's further consideration.

### 1. *Rescission Under the TILA*

■ The TILA protects a consumer from fraud, deception, and abuse by requiring the creditor to disclose to the consumer certain information about the subject financing. (15 U.S.C. § 1601; see, e.g., 12 C.F.R. §§ 1026.17–1026.23 (2016).)[6] It generally entitles a consumer who has

---

[6] Except where otherwise indicated, all statutory references in this part II.A. are to title 15 of the United States Code.

secured a credit transaction with a lien on the consumer's principal dwelling (including the refinancing of an existing mortgage) to rescind a loan transaction within three business days. (§ 1635(a).) Moreover, the rescission period is extended to "three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first," if the TILA disclosures (including notice of the right to rescind) are not provided. (§ 1635(f); see 12 C.F.R. § 1026.23(a)(3)(i) (2016).)

To exercise the right of rescission, the consumer must notify the creditor of his or her intention to rescind "by mail, telegram or other means of written communication." (12 C.F.R. § 1026.3(a)(2) (2016).) Notice is "considered given when mailed . . . to the creditor's designated place of business." (*Ibid.*; see § 1635(a).)

■ The TILA sets forth a specific procedure for undoing the transaction in section 1635(b). When the consumer exercises the right to rescind, the consumer is "not liable for any finance or other charge, and *any security interest given by the obligor . . . becomes void upon such a rescission.*" (§ 1635(b), italics added.) "Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." (§ 1635(b); see 12 C.F.R. § 226.23 (2016).) "Upon the performance of the creditor's obligations under this section," the consumer "shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the [consumer] shall tender its reasonable value." (§ 1635(b).)

Thus, as with any rescission remedy, the intent is to return the parties to the status quo ante. Unlike rescission at common law, however, the procedure set forth in section 1635(b) does not require the borrower to tender first, thus giving leverage to consumers and exposing lenders to situations in which the borrower has no funds to return the principal while the debt is no longer secured. (See *Merritt v. Countrywide Financial Corp.* (9th Cir. 2014) 759 F.3d 1023, 1030 (*Merritt*).)

Furthermore, a creditor's failure to comply with the requirements of section 1635 subjects it to actual and statutory damages, attorney's fees, and costs. (§ 1640.) And if the consumer tenders the property to the creditor, the creditor must take possession of it within 20 days or "ownership of the property vests in the [consumer] without obligation on [the consumer's] part to pay for it." (§ 1635(b).)

■ However, after setting forth the rescission procedures we have just described, Congress added the following proviso: "The procedures prescribed

by this subsection shall apply *except when otherwise ordered by a court.*" (§ 1635(b), italics added; see 12 C.F.R. § 226.23 (2016).) By turning to the court, a lender may change its fortunes in at least two ways. First, it may challenge the validity of the rescission—that is, whether there was a failure to disclose information, such that the time for rescission under the TILA was extended to three years. Second, whether or not the lender agrees that the rescission was timely and valid, it may request that a different procedure be used to effectuate the rescission remedy; thus, courts have sometimes required the borrower to tender the loan proceeds *first*, before the creditor must give up its security interest. (See, e.g., *Yamamoto v. Bank of New York* (9th Cir. 2003) 329 F.3d 1167, 1170–1173 *(Yamamoto)*.)

### 2. The Trial Court's Decision

As mentioned, the trial court in this case rejected appellants' rescission defense on two grounds. First, recognizing a split in authority but siding with the Ninth and Tenth Circuit Courts of Appeals, the court concluded that a notice of rescission is not, in itself, sufficient to rescind, and that an actual lawsuit must be filed within the three-year period: "Naifeh did not file a lawsuit to enforce whatever rescission rights she had in a timely way, and the Promissory Note and Deed of Trust were never rescinded."

Second, the court ruled, even if a mere notice of rescission could suffice, in this case "the evidence does not support [appellants'] position that the rescission was self-executing and sufficient to justify recording the Substitution of Trustee and subsequent documents executed and/or recorded by [appellants]." The court concluded that "the mere sending of the notices did not have the automatic effect of rescinding the transaction." And it rejected Naifeh's proposition that rescission was automatic because respondent (or its predecessors) had acquiesced in it, since the evidence did not show an acquiescence and, in fact, they were foreclosing on the Property.

Appellants contend the court erred in light of *Jesinoski, supra*, 574 U.S. ___ [135 S.Ct. 790].

### 3. Jesinoski

The United States Supreme Court issued its decision in *Jesinoski* several months after the trial court's decision. In *Jesinoski*, the borrowers had sent a rescission letter three years after refinancing their home, and the lender's successor did not acknowledge its validity. (*Jesinoski, supra*, 574 U.S. at p. ___ [135 S.Ct. at p. 791].) About a year later—four years after the transaction originating the loan—the borrowers filed a lawsuit seeking to enforce the rescission. (*Ibid.*) Like the trial court here, the federal district

court and the Eighth Circuit Court of Appeals concluded there had been no rescission because the borrowers had not filed a lawsuit within three years of the date of the loan's consummation. (*Ibid.*)

■ The Supreme Court reversed, holding that the borrower need only send the notice of rescission, not file a lawsuit, within the three-year period. The court explained that section 1635(a) sets forth unequivocally how the right to rescind is to be exercised: "It provides that a borrower 'shall have the right to rescind . . . by *notifying the creditor, in accordance with regulations of the Board, of his intention to do so'* (emphasis added). The language leaves no doubt that rescission is effected when the borrower notifies the creditor of his intention to rescind. It follows that, so long as the borrower notifies within three years after the transaction is consummated, his rescission is timely. The statute does not also require him to sue within three years." (*Jesinoski, supra,* 574 U.S. at p. ___ [135 S.Ct. at p. 792].)

### 4. Impact of Jesinoski on Naifeh's Rescission Notice

#### a. Timeliness of Naifeh's Rescission Notice

Naifeh's notice of rescission occurred within the three-year period, since her loan originated on March 14, 2007, and she sent her rescission notice on July 18, 2009. Under *Jesinoski*, the fact that Naifeh did not file a lawsuit within the three-year period does not render the notice untimely.

#### b. Effect of Naifeh's Rescission Notice

Respondents urge, however, that the trial court correctly concluded that Naifeh's rescission notice did not have the automatic effect of rescinding the transaction (that is, without respondent's acquiescence or a court approving the rescission), and nothing in *Jesinoski* suggests otherwise. On this point, the parties each rely on cases that ostensibly support their respective positions.

Appellants argue, and several cases remark, that rescission *is* automatic upon the consumer's notice under the procedure set forth in section 1635(b). (See, e.g., *Merritt, supra,* 759 F.3d at p. 1030 [under the procedure set forth in § 1635(b), " ' "all that the consumer need do is notify the creditor of his intent to rescind," ' " and the " ' "agreement is then automatically rescinded" ' "]; *Sherzer v. Homestar Mortgage Services* (3d Cir. 2013) 707 F.3d 255, 258 ["rescission occurs automatically when the obligor validly exercises his right to rescind," as opposed to having to file a lawsuit]; *Williams v. Homestake Mortgage Co.* (11th Cir. 1992) 968 F.2d 1137, 1140 [agreement "automatically rescinded" when consumer notifies the creditor of his intent to rescind]; see *Lippner v. Deutsche Bank National Trust Co.* (N.D.Ill. 2008)

544 F.Supp.2d 695, 702 [where creditor conceded it had violated the TILA and the consumer had timely exercised her right to rescind, the creditor was obligated under § 1635 to honor the rescission demand, and the failure to do so was a further TILA violation].) And the court stated in *Jesinoski, supra,* 574 U.S. at p. ___ [135 S.Ct. at p. 792], "rescission is effected when the borrower notifies the creditor of his intention to rescind."

On the other hand, respondent points us to *Yamamoto, supra,* 329 F.3d 1167, on which the trial court relied. In *Yamamoto,* the borrowers sent the lender a notice of rescission and then sued, seeking damages and rescission. The district court ruled that the borrowers had to tender the loan proceeds; when they were unable to do so, the court dismissed their lawsuit. Noting that section 1635(b) expressly permits a court to modify the procedures set forth in that section, the Ninth Circuit Court of Appeals held that the trial judge had the discretion to "condition" rescission on the borrower's tender. If the lender had *acquiesced,* the transaction would have been rescinded automatically; but because the lender *contested* the rescission notice and produced evidence about the sufficiency of the disclosures, it "cannot be that the security interest vanishes immediately upon the giving of notice." (*Yamamoto, supra,* 329 F.3d at p. 1172.) The court explained: "Otherwise, a borrower could get out from under a secured loan simply by *claiming* TILA violations, whether or not the lender had actually committed any. Rather, under the statute and the regulation, the security interest 'becomes void' only when the consumer 'rescinds' the transaction. In a contested case, this happens when the right to rescind is determined in the borrower's favor." (*Ibid.*)[7]

*Yamamoto* continued: "Thus, a court may impose conditions on rescission that assure that the borrower meets her obligations once the creditor has performed its obligations. Our precedent is consistent with the statutory and regulatory regime of leaving courts free to exercise equitable discretion to modify rescission procedures. This also comports with congressional intent that 'the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after

---

[7] *Yamamoto* (and the trial court in this case) quoted *Large v. Conseco Finance Servicing Corp.* (1st Cir. 2002) 292 F.3d 49, 54–55, which observed: " '[N]either the statute nor the regulation establishes that a borrower's mere assertion of the right of rescission has the automatic effect of voiding the contract.' [Citation.] Instead, the 'natural reading' of the language of § 1635(b) 'is that the security interest becomes void when the obligor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker has so determined . . . . Until such decision is made, the [borrowers] have only advanced a claim seeking rescission.' " (*Yamamoto, supra,* 329 F.3d at p. 1172.) This suggests that no rescission occurs until the lender or a court says so; as such, it is a broader concept than the one at the heart of *Yamamoto* and on which we rely: that Congress has given courts authority to change the procedural order of the rescission process by requiring the borrower to tender first in the appropriate case.

the creditor has performed his obligations as required by the act.' S.Rep. No. 368, 96th Cong., 2d Sess. 29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 236, 265." (*Yamamoto, supra*, 329 F.3d at p. 1173.)[8]

 *Yamamoto* is readily harmonized with the cases finding automatic rescission. A timely notice of rescission automatically renders the security interest void under section 1635(b), where the creditor *acquiesces* in the rescission or *ignores* it. However, once the creditor *contests* the notice of rescission, the court may alter the procedure otherwise dictated by the TILA, determine whether there were inadequate disclosures that would extend the rescission period to three years, and decide whether equity compels a requirement that the borrower tender the loan proceeds before the lender returns the amounts paid and releases its security interest. This accomplishes the legislative goals of protecting the borrower from nondisclosures, motivating the lender to respond to the borrower's concerns, and returning the parties to the status quo ante in a manner consistent with the facts and equities of the particular situation.

Indeed, even those federal appellate cases on which appellants rely for the proposition that rescission is "automatic" expressly recognize the authority of courts to condition the voiding of the security interest for equitable reasons. (E.g., *Merritt, supra*, 759 F.3d at pp. 1030–1032; *Sherzer v. Homestar Mortgage Services, supra*, 707 F.3d at p. 260 ["if either the obligor or the creditor sues after the obligor sends notice of rescission, the court has the discretion to modify the order in which the obligor and creditor are required to exchange property or disclaim security interests"]; *Williams v. Homestake Mortgage Co., supra*, 968 F.2d at pp. 1141–1142 [to effect a "realistic recognition of the full scope of the statutory scheme," "we hold that a court may impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all surrounding circumstances," including "conditioning the voiding of [the lender's] security interest"].)

---

[8] Appellants urge that *Yamamoto* is inconsistent with *Merritt* and *Jesinoski*. To the contrary, *Merritt* fully embraced *Yamamoto* and confirmed its premise that courts have authority to modify the statutory rescission process; *Merritt* merely held that the court could not dismiss an action at the *pleading* stage for the plaintiff's failure to tender before filing suit (as opposed to the summary judgment stage at issue in *Yamamoto*), because the creditor had not yet produced evidence regarding compliance with the disclosure requirements and the court could not evaluate the relevant equitable considerations. (*Merritt, supra*, 759 F.3d at pp. 1030–1032.) *Jesinoski* ruled that the TILA's language "leaves no doubt that rescission is effected when the borrower notifies the creditor of his intention to rescind." (*Jesinoski, supra*, 574 U.S. at p. ___ [135 S.Ct. at p. 792].) But *Jesinoski* dealt with the means by which the right to rescind is initially effected, not the manner in which the procedural requirements for the rescission remedy may be reordered by a court to reflect the equities of the situation.

■ Moreover, the plain language of the statute compels the conclusion that a court is empowered to facilitate equity in implementing a rescission under the TILA. Section 1635(b) provides that "[t]he procedures prescribed *by this subsection* shall apply except when otherwise ordered by a court." (Italics added.) Those procedures include the voiding of the security interest, the termination of the obligor's liability, and the process for restoring the parties to the status quo. The unequivocal expression of legislative intent is that the court may modify any or all of these matters to assure that the rescissionary remedy is imposed equitably in a given case.

### 5. *Implications for This Case*

In light of *Jesinoski*, appellants urge that Naifeh's notice of rescission divested BofA of its security interest in the Property, renders the foreclosure sale void, and deprived respondent of standing to pursue its claims for cancellation of instruments.

■ But those conclusions are premature. Appellants raised the rescission issue as an affirmative defense in this case. They therefore placed at issue whether there was, in fact, a timely rescission, which requires proof that the disclosures required by the TILA were not provided, so as to extend the rescission period to three years. That issue has not yet been decided by the trial court.

If the TILA disclosures were *not* deficient, Naifeh's rescission notice under the TILA was to no avail (since it was sent beyond the three-day period), appellants' affirmative defense fails, and the security interest in the Property was not void. In that instance, respondent would be entitled to judgment on its cancellation claims.

On the other hand, if the TILA disclosures *were* deficient, Naifeh's notice of rescission was timely because it was sent within the extended three-year period, and the trial court may, under section 1635(b), determine what procedure to impose to return the parties to the status quo ante, including whether Naifeh should be required to tender. (Although Naifeh proposed resolving her dispute with respondent's predecessors, we are not pointed to any indication in the record that she actually made a valid tender of full and unconditional performance, or demonstrated the willingness and ability to pay back the loan proceeds she received in the financing transaction.) If a tender is required and not made, Naifeh will not have met the requirements for a rescissionary remedy, and therefore may not use rescission as an affirmative

defense. But if the rescissionary remedy *is* completed, the security interest in the Property is void, the foreclosure sale is void, and the trial court must reevaluate respondent's standing and the merits concerning respondent's claims for cancellation of instruments.[9]

We will therefore vacate the judgment in this case and remand to the trial court for further proceedings with respect to appellants' affirmative defense of rescission. We nevertheless address appellants' remaining arguments in the unpublished portion of this opinion, both to complete our analysis and to guide the court and parties upon remand.

B.–D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment is vacated. On remand, the trial court shall determine whether the disclosures provided to Naifeh and Ristic regarding their loan were in compliance with the TILA. If so, the judgment shall be reinstated. If not, the trial court shall consider the procedure by which the rescission

---

[9] At oral argument, appellants contended the trial court lacks authority to decide whether the rescission notice was valid, because U.S. Bank did not contest the notice within 20 days of receipt. They base this on the TILA's procedure requiring lenders to return funds and take steps to reflect the security interest's termination within 20 days after receiving the notice. (See also *Paatalo v. JPMorgan Chase Bank* (D.Or. 2015) 146 F.Supp.3d 1239, 1245 [lender must unwind the loan or file a lawsuit within the "TILA statute of limitations"].) However, the TILA does not specify that a lender in fact loses its right to challenge the rescission, or a court loses its statutory authority to modify the rescission procedures, merely because the lender did not contest the rescission notice within 20 days. Indeed, the 20-day response period is part of the procedure the TILA explicitly states a court *may* modify. (We also note that U.S. Bank's predecessors may not have seen a reason to challenge Naifeh's notice of rescission because, before *Jesinoski*, the Ninth Circuit law was that no rescission was effected unless the borrower had actually filed a lawsuit.) In addition, U.S. Bank countered at oral argument that appellants cannot pursue the rescission theory at all, because the foreclosure sale has already occurred— arguing implicitly that a borrower must enforce the rescission and obtain an injunction precluding the sale. (See *Mikels v. Estep* (N.D.Cal., Apr. 19, 2016, No.12-cv-00056-EMC) 2016 U.S.Dist. Lexis 52450, p. *3 [TILA rescission provision no longer applies once the property is sold, even if a valid notice of rescission was sent before the sale]; see also *Jacques v. Chase Bank USA, N.A.* (D.Del., Feb. 3, 2016, No.15-548-RGA) 2016 U.S.Dist. Lexis 12522, p. *29 & fn. 10 [under federal law, borrower's TILA claim against lender was time-barred, because there is a one-year statute of limitations for violations of § 1635(b), which runs from 20 days after borrower provides notice of rescission].) We need not and do not decide these issues, because the trial court did not decide them, and the parties did not fully brief them in this appeal. And in this case, appellants were the ones who placed the rescission at issue.

[*] See footnote, *ante*, page 767.

remedy shall be finalized, rule on appellants' affirmative defense of rescission, conduct such further proceedings as may be consistent with this opinion, and enter judgment accordingly. Appellants shall recover their costs in this appeal from respondent.

Jones, P. J., and Bruiniers, J., concurred.

A petition for a rehearing was denied August 17, 2016, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 9, 2016, S236902. Chin, J., did not participate therein.